The Montgomery Co. v. Commissioner.
Montgomery Co. v. Commissioner
Docket No. 87041.
United States Tax Court
T.C. Memo 1963-104; 1963 Tax Ct. Memo LEXIS 240; 22 T.C.M. (CCH) 479; T.C.M. (RIA) 63104; April 10, 1963
D. Paul Alagia, Jr., Esq., 650 Baxter Ave., Louisville, Ky., and J. Bernard Brown, *241 Esq., for the petitioner. Arthur Clark, Jr., Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in the income tax liability of The Montgomery Co. for the calendar years 1953 and 1955 in the amounts of $7,975.67 and $80.30, respectively. The sole issue for decision is whether petitioner sustained a deductible loss under the provisions of section 165 of the 1954 Code by reason of the demolition of certain buildings in 1955. [1]
*242 Findings of Fact Some of the facts have been stipulated and are hereby found as stipulated. The petitioner, The Montgomery Co., is a corporation organized and existing under the laws of the Commonwealth of Kentucky and has its office and principal place of business at Second and Liberty Streets in Louisville, Kentucky. For the taxable years 1953 and 1955, petitioner filed Federal corporate income tax returns with the district director of internal revenue for the district of Kentucky. Montgomery Auto Company (hereinafter referred to as Auto) was organized on January 26, 1948, to engage in the business of selling automobiles and trucks under a franchise from the Chevrolet Motor Division of General Motors Corporation. Auto also operated an insurance business. Auto owned a certain parcel of real estate located at the southeast corner of Liberty Street [2] and Second Street [3] in Louisville. In 1948, petitioner contemplated building a new service center at this location. In May of that year, the Chevrolet Motor Division of the General Motors Corporation prepared a set of blueprint layouts for petitioner's use. The layouts disclosed that the proposed structure extended on to an *243 adjoining piece of property located at 411 South Second Street (hereinafter referred to as the 2nd Street property) and would have necessitated the demolition of certain buildings on the 2nd Street property. At the time, the 2nd Street property was owned by O. D. Robbins (hereinafter referred to as Robbins) and was occupied by his company, Kentucky Bearing Service, Inc. (hereinafter referred to as Kentucky Bearing). Raymond E. Montgomery, Sr., (hereinafter referred to as Raymond) the president of Auto, approached Robbins with a proposal to purchase the 2nd Street property. Robbins declined to sell the property at that time. Subsequently, on July 22, 1948, and August 24, 1948, Raymond purchased real estate on the north side of Liberty Street and east of Second Street. This property was located on the east side of Auto's then existing building. On May 2, 1949, Auto's board of directors held a special meeting and authorized the construction of a building on the property purchased. A new service center building was completed in 1950. On May 30, 1952, Auto's corporate name was officially changed to Montgomery Chevrolet, Inc. *244 (hereinafter referred to as Montgomery, Inc.). By 1953, Robbins had decided to build a new building and move Kentucky Bearing to a new location. In February 1953, Robbins entered into a contract with Harry K. Moore (hereinafter referred to as Moore), a real estate broker, to sell the 2nd Street property. The asking price for the property was $35,000. Robbins advised Moore that he did not think that Montgomery, Inc., would be interested in buying the 2nd Street property because it had already erected a service center across the street. However, Moore did contact Raymond in an effort to sell the 2nd Street property to Montgomery, Inc. The 2nd Street property was located directly to the south of Montgomery, Inc.'s property located at the southeast corner of Liberty Street and Second Street. The two pieces of property were separated by a narrow private alley. The property consisted of a tract of land, approximately 50 feet wide and 100 feet deep, and three buildings. The buildings were connected by common brick walls. The buildings were approximately 80 feet deep. The total width of the three buildings was approximately 50 feet. Two of the three buildings contained upper floors which *245 were utilized for residential purposes. In 1953, the buildings containing the apartments were approximately 60 years old and the remaining building was approximately 25 years old. Raymond examined the buildings to ascertain whether or not they could be used in petitioner's operation. Raymond was interested in determining what partitions in the buildings could be removed. On March 16, 1953, petitioner's board of directors met in special session and resolved as follows: The Chairman then advised the board that he had been approached by the agent of Mr. O. D. Robbins who operates the Kentucky Bearing, Inc. and who owns the property, bounded by our present used car lot and the alley on Second Street with an offer to sell this property to the Montgomery Chevrolet, Inc. After careful consideration upon the matter on motion made, seconded and unanimously carried, it was resolved that WHEREAS, The company was in need of larger quarters for used cars and trucks and WHEREAS, The purchase of this particular property would round out the company's holdings and WHEREAS, It would give the company an additional 5,000 square feet of space to use as either space to display used cars and *246 trucks or as space to erect used car and truck reconditioning plant which the company does not now have and is becoming increasingly more necessary, and WHEREAS, The company has sufficient funds with which to purchase this property without endangering its operating capital NOW THEREFORE BE IT FURTHER RESOLVED, That the Chairman negotiate for the purchase of said property for a sum not to exceed $30,000.00. Raymond negotiated a sale, with Moore, for the 2nd Street property. On May 15, 1953, the property was sold to Montgomery, Inc., for $27,680.50. At the time of the acquisition of the 2nd Street property, Raymond advised Robbins and his son, O. D. Robbins, Jr. (hereinafter referred to as Robbins, Jr.), that Kentucky Bearing could continue to occupy the property until it acquired its new location. An offer was made to lease the property to Kentucky Bearing for at least one year. No lease was ever entered into because it was expected that Kentucky Bearing's new location would be completed in less than one year. However, Kentucky Bearing did occupy the premises until October 1953 on a month-to-month rental basis. Raymond died on May 27, 1953. On July 15, 1953, Montgomery, Inc. *247 , changed its name to The Montgomery Co., the petitioner herein, and transferred its operating assets (exclusive of the real estate, plant, buildings and its insurance business) to a new corporation known as Montgomery Chevrolet, Inc. (hereinafter referred to as Chevrolet), in exchange for all the capital stock of Chevrolet. Thereafter, petitioner operated the insurance business and leased its real estate to Chevrolet, the car dealership. On July 16, 1953, petitioner entered into a lease agreement with Chevrolet for a term of five years. Chevrolet was granted the use and occupancy of all of the petitioner's real estate located at or near Second and Liberty Streets, including the 2nd Street property, at a rental of $2,000 per month. Petitioner collected $150 in July 1953 for ground floor rental from Kentucky Bearing. Thereafter, Chevrolet, the lessee, collected the following as sublease rentals for the period of August 1953 to March 1955: Portion of
Upstairs
Ground
Apart-
Upstairs
Floor
Ground
ment
Apart-
Inter-
Floor
F.A.
ment
state
Kentucky
Van-
T. Car-
Chemi-
Bearing
decar
roll
cal
8-53 $150
9-53
150
10-53
150
11-53
$ 23
$ 28
12-53
23
28
$ 15
1-54
23
28
15
2-54
23
28
15
3-54
23
28
15
4-54
23
28
15
5-54
23
28
15
6-54
23
28
15
7-54
23
28
15
8-54
23
28
15
9-54
23
28
15
10-54
23
28
15
11-54
23
28
15
12-54
23
28
15
1-55
23
28
15
2-55
23
28
15
3-55
23
7
Total $450 $391 $455 $225
*248 Except for a portion of the ground floor that was rented to Interstate Chemical Company, after October 1953, Chevrolet used the ground floor of the 2nd Street property to store bulky articles such as motors, body parts, and drums of under-coat material. In petitioner's books of account, the cost of the 2nd Street property was allocated to the land and buildings on the basis of $250 per front foot for 48 front feet of land, or a total of $12,000, and the balance of $15,680.50 was charged to the buildings. Depreciation on the buildings was taken on the basis of a 20-year useful life. This allocation was utilized by petitioner in computing the depreciation deductions claimed on its Federal income tax returns and in computing the amount of the claimed demolition loss deduction at issue in this case. The stockholders of petitioner held an annual meeting on April 4, 1955. The minutes of the meeting stated, in part, as follows: The regular annual meeting of the stockholders of The Montgomery Co. was held at the office of the company, 133 West Liberty Street, Louisville, Kentucky, on April 4, 1955, at 10:00 o'clock a.m. The following stockholders, representing a majority of the outstanding *249 shares of capital stock, were present as follows: No. of
Name
Shares
Louise C. Montgomery
413
Louise C. Montgomery, Executrix of
the Estate of Raymond E. Mont-
gomery
430
Schuhmann Montgomery
50
Richard Montgomery
50
Louise C. Montgomery acted as Chairman of the meeting and Richard Montgomery acted as Secretary thereof. The Secretary, at the direction of the Chairman, read the minutes of the previous meeting which were unanimously approved as read. The Chairman led a discussion of the financial condition of the company and of its operations for the year of 1954, and Schuhmann Montgomery, Vice President, gave a report of the insurance business and earnings of the company and made his recommendations and report of plans with respect to further expansion and possible growth of the insurance business and the possible arrangements which might be made for representation of more companies with whom he has been in contact through their representatives. Considerations were then given to the advisability of demolishing the building on the South side of the Second Street parking lot and being the improvements located on the property acquired from the Kentucky *250 Bearing Company. The Chairman stated that due to the great need of Montgomery Chevrolet, Inc., lessee, for the utility of all available space for parking lot and used car operations, permission had been requested by the lessee for the demolition of the building at the expense of the lessee in order that the space might be used to better advantage in the operation of the business of lessee's automobile agency. The directors then discussed the advantages and disadvantages of the removal of the buildings in accordance with the request of the lessee and upon motion made, seconded and unanimously carried it was resolved that authorization be given to the lessee for the demolition of the buildings and further resolved that timely notice be given to the city and county tax assessors' offices that proper adjustment and credit may be given in the tax assessments to be made by the said taxing authorities on January 1, 1956. In August 1955, the buildings on the 2nd Street property were demolished. On its Federal income tax return for 1955 petitioner deducted $13,916.45 as a loss from the demolition of its buildings. In the notice of deficiency, respondent disallowed the loss by determining *251 that it was "not allowable under the provisions of Section 165 of the Internal Revenue Code of 1954." Opinion On its Federal income tax return for 1955, petitioner deducted $13,916.45 as a loss from the demolition of the buildings on the 2nd Street property. Whether petitioner is entitled to the claimed loss under section 165 of the 1954 Code [4] depends on whether petitioner intended, at the time the property was acquired, to demolish the buildings, either immediately or at some future date. Providence Journal Co. v. Broderick, 104 F. 2d 614 (C.A. 1, 1939); section 165-3, Income Tax Regs.[5] The rationale behind this rule was stated in N. W. Ayer & Son, Inc., 17 T.C. 631 at page 635 (1951): If the property is bought with the intent to raze the buildings situated thereon and erect a new building, no deduction is allowed at the time of demolition. Liberty Baking Co. v. Heiner (C.A. 3, 1930), 37 F. 2d 703; Providence Journal Co. v. Broderick (C.A. 1, 1939), 104 F. 2d 614; Robert B. Griffin, 17 B.T.A. 255 (1929); and Lansburgh & Brother, Inc., 23 B.T.A. 66 (1931). The fact that a *252 certain value was placed on the buildings at the time of the purchase, that rent was collected, and depreciation claimed has been held to be immaterial where at the time of purchase the intent was to demolish the buildings. Providence Journal Co. v. Broderick, supra.The rationale of such cases is that where there is a purchase of land with the intent to demolish any building situated thereon and erect a new one, no part of the price paid is allocable to the buildings since the buildings have no value to the purchaser and it is the land which is purchased, not the land and buildings. The purchase price, therefore, represents the cost of the land. *253 See also Lynchburg National Bank & Trust Co., 20 T.C. 670, (1953), affd. 208 F. 2d 757 (C.A. 4, 1953); Hillside National Bank, 35 T.C. 879, (1961); Panhandle State Bank, 39 T.C. - (February 14, 1963). Petitioner contends that at the time it purchased the 2nd Street property it had no intention of demolishing the buildings. To support its position, petitioner contends that it was not actively seeking to purchase the 2nd Street property, that it did not need the property in 1953, and that it had been its practice, when the opportunity presented itself, to acquire property in the area where the automobile agency was being conducted. Petitioner also alleges that at the board of directors' meeting in March 1953 the possible uses of the property, such as storage of bulky parts, motor blocks, drums of undercoat, etc., were discussed. Petitioner also maintains that the building could have been remodeled at a cost which was not prohibitive to display used cars inside. In connection with this argument, petitioner alleges that Raymond inspected the 2nd Street property to see how it would lend itself to the operation of the car agency and to see what *254 partitions could be removed. Petitioner points out that, after Kentucky Bearing moved out of the buildings in October 1953, the ground floor was actually used for storage until the buildings were demolished in August 1955. Finally, petitioner contends that the "building was demolished as a result of a substantial change in the economic or business conditions of the automobile dealership which was experiencing a boom in automobile sales which resulted in a boom of used car sales, which required the agency to need more space for its operations, as a result of which it requested the lessor's [petitioner] permission to demolish the building * * *." Respondent contends that petitioner's intention at the time of acquisition was to demolish the buildings. To support his position, respondent points out that the minutes of the board of directors of March 1953 state that the company was in need of larger quarters for used cars and trucks and that the property would give it an additional 5,000 square feet of space to use as either space to display used cars and the trucks or as space to erect a used car and truck reconditioning plant which the company did not have and was becoming increasingly *255 more necessary. Respondent contends that the property was not adaptable to indoor display. Respondent alleges that the buildings were old, that each building was only about 18 feet wide and 80 feet deep, and the buildings were connected by common brick walls which were apparently the structural support for the roof. Respondent contends that at no time after acquisition were the buildings utilized for any of the permanent or semi-permanent uses for which the property was purportedly acquired. It is pointed out that after Kentucky Bearing moved out, a portion of the first floor and all the second and third floors were rented out for minimal amounts. The balance, respondent contends, was utilized by petitioner for the incidental storage of some of its bulky parts. Respondent concludes that the motivation in acquiring the 2nd Street property was the utilization of the buildings for whatever interim purposes might be most advantageous, but with the purpose of utilizing the land for additional used car display area which it was anticipated that future circumstances would warrant. We agree with respondent. It is true that petitioner was not actively seeking the 2nd Street property. However, *256 this does not indicate what petitioner intended to do with the property once it was acquired. Again, the fact that petitioner may have had no immediate need for the property is not an indication of its intended use. Furthermore, it is not necessary that petitioner's intent be to demolish immediately. Section 1.165-3(a), Income Tax Regs., supra. It seems apparent that petitioner was only interested in the land located at 411 South Second Street. The March 16, 1953, minutes of the board of directors are consistent with an intention to demolish the buildings and use the land. In part, the minutes state that: WHEREAS, The company was in need of larger quarters for used cars and trucks and WHEREAS, The purchase of this particular property would round out the company's holdings and WHEREAS, It would give the company an additional 5,000 square feet of space to use as either space to display used cars and trucks or as space to erect used car and truck reconditioning plant which the company does not now have and is becoming increasingly more necessary, * * * The testimony of petitioner's two officers is not particularly helpful and does not lead to a different *257 conclusion. The only explanation Raymond E. Montgomery, Jr., gave for the acquisition of the 2nd Street property was that "it was a little section there that would have completely rounded out our holdings on that side of the street." George W. Schuhmann, [6] petitioner's other officer, testified as follows on direct examination: Q. Mr. Schuhmann, at the time this property was acquired, I want you to tell the Court if your Company had any intention to tear down this building? A. No, sir. Q. I want you to tell the Court if your company had any particular use for the building? A. No, sir. Q. Now, in these Minutes, Mr. Schuhmann, referring to, it says "Whereas the Company was in need of larger quarters for used cars and trucks; and, Whereas the purchase of this property would round out the company's holdings; and, Whereas as it would give the company an additional 5,000 feet of space to use as either space to display used cars and trucks," had your company decided to display used cars and trucks in that area of 411 South Second Street on this property? A. We couldn't display them inside, because the building had not big enough doors to get the units in. It would have to be *258 remodeled. Q. You could have remodeled the building, and would the cost, in your opinion, and your experience in the Chevrolet business, had been prohibitive? A. Oh, no. Q. It wouldn't have been a very big thing to put a door on there to use the building as a display place for used cars? A. That is right. * * *
Q. Now, tell the Court if - well, refer to those Minutes of March 16, '53, again, that part where it says it would give the company an additional 5,000 feet of space to use as either space to display used cars and trucks. Had your company thought about using the building after remodeling for displaying used cars and trucks? A. Yes. Q. I mean your company actually thought about that? A. Oh yes. It is a fortunate dealership that has both inside and outside display facilities. Q. For their used car business? A. Yes, sir. If, as Schuhmann testified, petitioner had no intention of demolishing the buildings but had no use for them, we find it difficult to understand what petitioner intended to do with the property. This is especially true since the buildings covered *259 almost the entire property. The explanation of this testimony would appear to be that petitioner had no use for the buildings but did not intend to demolish them immediately. If, as Schuhmann testified, the buildings could have been converted to inside display use at a cost that was not prohibitive, it is difficult to see why it was not done. Cf. Panhandle State Bank, supra. This is especially true in light of his statement that "it is a fortunate dealership" that has both inside and outside display. Using the buildings for inside display appears to have been little more than a passing afterthought which was never given any serious consideration. There is no evidence that there was ever an attempt to remodel the buildings or in any way to use them for inside display. From the facts, it does not appear that the buildings could have been economically used for display purposes without extensive remodeling. The buildings were old and there is considerable doubt as to whether the common walls between the buildings could have been removed because there is evidence that these were supports for the roof. The buildings were relatively narrow [7] which would have made it difficult *260 to get cars in and out and would most likely have resulted in an uneconomic use of space. Petitioner had been in the habit of buying property in the area. It seems obvious that this was done to keep pace with an expanding car business. Logically, it would appear that petitioner was not buying property just to be buying it. In so far as the 2nd Street property is concerned, it seems clear that its most advantageous use was for open display purposes. While Chevrolet did use the 2nd Street property for storing bulky items, this apparently was only an incidental or interim use. There seems to be little doubt that a "big car year" was the factor that finally put the demolition machinery in action. However, it was not totally unexpected that the car business would grow. According to the minutes of the board of directors on March 16, 1953, petitioner *261 had a need for larger quarters for used cars and trucks. Since these were customarily displayed outside, it is only logical that petitioner would choose the method which would give the most room at the most economical cost, that is, to demolish the buildings and use an open space. Based on the record before us, we hold that petitioner has failed to prove that its intent at the time it acquired the 2nd Street property was other than to demolish the buildings and use the land. Accordingly, the respondent's determination is sustained. Decision will be entered for the respondent. Footnotes
1. The taxable year 1953 is before us solely because a net operating loss for 1955 was carried back to 1953. On March 15, 1956, the petitioner filed an application for a tentative net operating loss carryback adjustment on Treasury Department Form 1139, in which it claimed a net operating loss carryback deduction of $15,337.82 from the taxable year 1955 to the taxable year 1953 under the provisions of section 172(b) of the Internal Revenue Code of 1954. On July 2, 1956, the respondent refunded to the petitioner the amount of $7,975.67 for the taxable year 1953 under the provisions of section 6411(b) of the Internal Revenue Code of 1954↩.
2. Runs east and west. ↩
3. Runs north and south.↩
4. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. ↩
5. § 1.165-3 Demolition of buildings. (a) Intent to demolish formed at time of purchase. (1) Except as provided in subparagraph (2) of this paragraph, the following rule shall apply when, in the course of a trade or business or in a transaction entered into for profit, real property is purchased with the intention of demolishing either immediately or subsequently the buildings situated thereon: No deduction shall be allowed under section 165(a)↩ on account of the demolition of the old buildings even though any demolition originally planned is subsequently deferred or abandoned. The entire basis of the property so purchased shall, notwithstanding the provisions of § 1.167(a)-5, be allocated to the land only. Such basis shall be increased by the net cost of demolition or decreased by the net proceeds from demolition.
6. Schuhmann is the brother of Louise Montgomery, petitioner's principal shareholder.↩
7. There was testimony that each building was approximately 18 feet wide. However, there is some doubt if they were even that wide. An exhibit indicates the land was approximately 50 feet in width, and it may have been 48 feet since this is the figure petitioner used in allocating the cost of the property between the land and buildings.↩